Filed 8/1/23  P. v. Rivera CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

ADRIAN ANTHONY RIVERA,

    Defendant and Appellant.

E079167

(Super.Ct.No. RIF2102360)

OPINION

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge.

Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and

Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and

Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Adrian Anthony Rivera of one count of rape in violation of Penal Code section 261 subdivision (a)(2). On appeal, he argues that the trial court prejudicially erred by admitting evidence of a prior uncharged offense. We find no error and affirm.

BACKGROUND

Jane Doe 1 met Rivera sometime around December 2020 or January 2021, when she purchased a computer from him. Several weeks later, someone broke into Doe 1's car and took her belongings. Doe 1 believed that Rivera did it, because the morning after the break-in she found a hat in the car that she had seen Rivera wear.

A. *The Incident Involving Doe 1*

In June 2021, Doe 1 sometimes lived with her boyfriend and sometimes slept in her car. One night that month, Doe 1 visited two friends in a motel room. Sometime after midnight, Doe 1 left the motel room and went out to her car, which was parked in the motel's parking lot. She planned to get food. Doe 1's car would not start, so she got a battery charger from the trunk. When Doe 1 reached into the car to get the charger, someone walked behind her and "grabbed [her] butt." Doe 1 turned her head around, realized that Rivera had done it, and told him, "'don't touch me.'" Rivera walked away. Doe 1 became nervous about being alone in the parking lot, but she did not want to return to the room because she did not want Rivera to see where she could be found. Doe 1 called her friends, but they did not answer.

2

Doe 1 opened the hood of the car and charged the battery. While she was at the front of the car with the hood up, Rivera approached Doe 1 and offered her $400 to have sex. She refused. Doe 1 released and stowed the support bar holding up the car's hood.

Rivera pushed the upper half of Doe 1's body underneath the hood of her car. The car's hood rested on top of Doe 1's head. Doe 1 was afraid of Rivera and concerned for her safety because Rivera had previously shown her a gun and said that "he was prepared." Rivera lifted Doe 1's dress, pushed her underwear to the side, and put his penis inside her vagina. Doe 1 did not agree to have sex with Rivera. She told Rivera "no," but she did not think that he heard her over the engine. Doe 1 "squirm[ed] some" in an attempt "to keep him from being able to do anything," moved her body away, and did not cooperate. Rivera got frustrated, said, "this isn't working," stopped, and walked away. Rivera's penis was inside Doe 1 for less than 30 seconds. Rivera used one of his hands to try "to get his penis to go in."

Doe 1 got into her car and drove away but immediately returned because she had left the battery charger, which she could not afford to replace. Doe 1 called her friends at the motel, but they did not answer. Doe 1 was "in a state of shock" and drove to the drive-through of a fast food restaurant and got food, as she had intended. Doe 1 drove back to the motel to be with her friends. Rivera was in the motel parking lot. Doe 1 ran upstairs and called 911 with her friends present. Doe 1 reported that she "just got raped in the parking lot." One of Doe 1's friends testified that when Doe 1 returned to the motel room she told them she had just been raped.

3

B. *The Investigation*

Two sheriff's deputies responded to the 911 call, and one interviewed Doe 1 and her two friends at the motel. Doe 1 "was visibly shaken" and appeared to have been "through some trauma." Doe 1 told the deputy that while she was in the parking lot jump-starting her car, Rivera grabbed her buttocks, propositioned her for sex, and sexually assaulted her.

The deputies investigated the location where Doe 1 said the assault had occurred. The dirt in the parking lot was damp and muddy. The deputies found two sets of overlapping footprints facing the parking lot. The shoeprints were consistent with the shoes Doe 1 and Rivera were wearing.

The deputies took Doe 1 to a hospital, where a nurse conducted a forensic examination. Doe 1 described to the nurse how she had been attacked from behind while looking under the hood of her car. Doe 1 had bruising on her front and inner left thigh. The nurse observed redness in Doe 1's "genital or vaginal area," where Doe 1 also reported feeling tenderness. The nurse swabbed Doe 1's genitals for DNA.

The parties stipulated that a criminalist who had analyzed some of the DNA samples collected from Doe 1 would testify that sperm on Doe's vagina and vulva and around her anus matched Rivera's DNA.

4

C.  *Uncharged Conduct Involving Jane Doe 2*

Jane Doe 2 testified that Rivera sexually assaulted her in March 2021.  Doe 2 was homeless at the time.  She described Rivera as an acquaintance she met several years earlier.

One afternoon in late March 2021, Doe 2 went to a motel (not the same one that Doe 1 visited in June) to visit her daughter-in-law.  Rivera was in a car parked in the motel parking lot.  Doe 2 parked next to him and asked if he had any methamphetamine to smoke.  Rivera indicated that he did, so Doe 2 got into his car.  Once Doe 2 got into Rivera's car, he drove away.  Rivera would not tell her where they were going.  He drove to a church, parked, and covered the windshield.

Rivera removed Doe 2's seat belt, reclined her seat, "jumped on top of" her, held her down, and started pulling her pants off.  Doe 2 asked Rivera "what he was doing" and told him that she had a boyfriend, to "[q]uit pulling [her] pants down," that she did not want to be with him "like that," and that she had not showered.  Doe 2 "said no."  She did not want to have sex with Rivera.  Rivera told her to "relax" and to "just . . . go with it" and "kept trying to push [her] back and pull [her] pants down."  Doe 2 was not wearing underwear.  Rivera pulled one of Doe 2's pant legs off.  Doe 2 struggled and attempted to push Rivera off of her, but he managed to pull up her legs.  Rivera penetrated her vagina with his penis but "not completely."  One of Rivera's hands was on his penis, and he used the other to stop Doe 2 "from moving around."  The assault lasted 10 to 15 minutes.  Doe

5

2 believed that Rivera had ejaculated inside of her. Doe 2 was not sure why Rivera stopped.

While he moved off of Doe 2's body, Rivera said, "I've been waiting a long time for this or I've been waiting a long time for you." Rivera returned to the driver's seat and offered Doe 2 a pipe to smoke methamphetamine, which she declined. Rivera gave Doe 2 perfume or body spray and drove her back to her car.

That night, Doe 2's daughter-in-law took her to a hospital because Doe 2 had a "bad headache." Doe 2 had run out of her blood pressure medication days before. Doe 2 did not tell her daughter-in-law or anyone at the hospital what had happened.

Three weeks later, Doe 2 was at her friend William M.'s house when Rivera showed up and asked to speak with Doe 2. Doe 2 and William were outside when Rivera arrived. Doe 2 started crying, went inside, did not interact with Rivera, and told William that she did not want Rivera there. Doe 2 told William that Rivera had raped her. William testified and confirmed that Doe 2 told him that Rivera "forced himself on her and that he raped her" about three weeks earlier. William said that Doe 2 was crying and breathing heavily. William described her as distraught, upset, nervous, and afraid.

Doe 2 did not report the rape to law enforcement. She feared Rivera, so she filled out the paperwork to get a restraining order against him but did not file it.

A detective who had worked in the sexual assault and child abuse unit of a law enforcement agency testified that adult sexual assault victims do not disclose for

numerous reasons, including embarrassment, shame, fear of the perpetrator, and not wanting to be stigmatized as a victim.

In February 2022, Bertram Blinn, an investigator from the district attorney's office, contacted Doe 2 and asked if she had any information about Rivera. Doe 2 told Blinn that Rivera had raped her. Doe 2 did not know Doe 1, but they had a mutual friend. Doe 2 had told the mutual friend what happened to her and gave the friend permission to provide Doe 1 with Doe 2's contact information.

D. *Defense Evidence*

Rivera called Blinn as a witness. Blinn had learned about Doe 2 from Doe 1, who texted him that Doe 2 might have some information. Doe 1 provided Blinn with Doe 2's contact information. Blinn interviewed Doe 2 twice. In the first interview, Doe 2 told Blinn that Rivera "'raped me'" eight to 10 months earlier. Doe 2 did not tell Blinn that she and Rivera had ever smoked methamphetamine with each other.

## DISCUSSION

Rivera argues that the trial court abused its discretion under Evidence Code section 352 by admitting evidence of the prior uncharged sexual offense against Doe 2. (Unlabeled statutory references are to the Evidence Code.) Rivera contends that the evidence of the uncharged offense "necessitate[d] undue consumption of time" (§ 352), which likely confused the jury "about why almost half the trial was spent on this uncharged act." We are not persuaded.

A. *Relevant Proceedings*

Before trial, the prosecution moved under section 1108 and section 352 to introduce evidence of the uncharged prior sexual offense against Doe 2. The prosecution argued that there would be "little or no possibility that the prior crime evidence [would] necessitate undue consumption of time," so the factor weighed in favor of admitting the evidence. The prosecution submitted that it would take approximately two to three hours to present the evidence to the jury. The prosecutor otherwise estimated that the trial would take eight days, but the prosecutor did not specify how much of that time would be allocated to testimony. The prosecution's witness list submitted the same day as the motion in limine included 11 possible witnesses, including Doe 2.

Defense counsel did not file a written opposition to the prosecution's motion. At the pretrial hearing on the motion, defense counsel argued that admission of the evidence would be "highly prejudicial to" Rivera, partly because it would require defense counsel to conduct "a trial within a trial." Defense counsel said that she "would spend a lot of time with that witness [(Doe 2)] because that evidence, propensity, could lead to a conviction even if the evidence in this current matter accedes."

Before hearing the parties' arguments on the issue, the court indicated that it was inclined to admit the evidence under section 352. The court ruled that the evidence constituted propensity evidence under section 1108 because it was a recent, similar act and that "when you consider on the issue of propensity, that's the relevant issue, that the probative value is not significantly outweighed by the prejudicial impact."

8

B. *Legal Framework*

In general, "evidence of prior criminal conduct is inadmissible to show a defendant's predilection to commit other criminal acts." (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1074; § 1101, subd. (a).) Section 1108 provides an exception to that general rule in cases involving sexual offenses. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1172.) In such cases, section 1108 provides that "evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible" as propensity evidence under section 1101 "if the evidence is not inadmissible" under section 352. (§ 1108, subd. (a).) Section 352 generally gives a trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's ruling under sections 352 and 1108 for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.) In reviewing the trial court's ruling on whether the "evidence would necessitate undue consumption of time," we review the determination "based on matters as they were before the trial court at the time of the motion, not at trial." (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1161 (*Winkler*).)

C. *Analysis*

Rivera concedes that the prior "alleged act was a sexual offense, a similar act, and recent in time," and he does not argue that the evidence was inadmissible under section 1108. He instead argues that the trial court "abused its discretion by essentially rubber-

9

stamping the [section] 1108 evidence without a more thorough section 352 analysis." His sole argument concerning why the evidence should have been excluded under section 352 is that the evidence about the prior uncharged act occupied "[a]pproximately 40 percent of the actual testimony at trial." The estimation is based on Rivera's posttrial assessment of the testimony of Doe 2, Blinn, Doe 2's friend William, and the detective who testified as an expert about why sexual assault victims do not report being assaulted. Rivera contends that the testimony concerning the uncharged conduct necessitated "an undue consumption of time, which weighed in favor of excluding the evidence," because "the jury was likely confused about why almost half the trial was spent on this uncharged act." The arguments lack merit.

We assume for the sake of argument that Rivera's calculation concerning the percentage of trial time allocated to the uncharged conduct evidence is accurate. In determining whether the trial court abused its discretion in admitting the evidence, we are concerned with only the information available to the trial court when it ruled on the prosecution's motion. (*Winkler*, *supra*, 56 Cal.App.5th at p. 1161.) When the court ruled on the pretrial motion, it had limited information about the amount of trial time that would be dedicated to the uncharged conduct evidence. The prosecution claimed that it would take two to three hours to introduce the uncharged act evidence, in a trial that was estimated to last eight days. Defense counsel argued that she would "spend a lot of time" cross-examining Doe 2 but did not quantify what that meant or whether she believed that the time spent cross-examining Doe 2 would be "undue" compared to the remainder of

10

the trial. On the basis of the information available when the court ruled on the evidence's admissibility, we conclude that the trial court did not abuse its discretion by admitting the evidence of the uncharged sexual offense against Doe 2 and thereby concluding that its admission would not "necessitate undue consumption of time" and substantially outweigh the evidence's probative value. (§ 352.)

Rivera's posttrial calculation that 40 percent of the trial testimony was dedicated to the uncharged conduct is not relevant to analyzing the propriety of the trial court's pretrial decision to admit the evidence. That calculation (or even an estimate similar to it) was not available to the court when it ruled on the evidence's admissibility. (*Winkler*, *supra*, 56 Cal.App.5th at p. 1161.) Moreover, defense counsel did not argue that admitting the evidence would be unduly time consuming.

We also reject Rivera's argument that "the probability of confusing the jury with [the uncharged act] evidence also weighed in favor of exclusion as the jury was likely confused about why almost half the trial was spent on this uncharged act." Again, when the trial court ruled on the evidence's admissibility, no party presented any information showing that so much time would be dedicated to testimony about the uncharged conduct. The court thus had no basis to conclude that the jury might be confused on that basis.

In any event, any possible confusion of the jury would have been mitigated by the instructions given. The jury was instructed with CALCRIM No. 1191A, which specified the limited way in which the jury could consider the uncharged act evidence. The jury

11

was instructed that if the prosecution proved by a preponderance of the evidence that Rivera had committed the prior uncharged act, then the jury could consider the evidence for the limited purpose of concluding that Rivera "was disposed or inclined to commit sexual offenses, and based on that decision, [the jury] also [could] conclude that [Rivera] was likely to commit and did commit the offense[] charged in this case, Rape."  The jury also was instructed that it could "not consider this evidence for any other purpose."  We presume the jury followed the instructions given.  (*People v. Parker* (2022) 13 Cal.5th 1, 71.)

For these reasons, we conclude that the trial court did not abuse its discretion under section 352 by admitting evidence of the prior uncharged sexual offense.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

CODRINGTON
Acting P. J.

RAPHAEL
J.

12